IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARENA ANALYTICS, INC., a Delaware corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| FREINDSHIP SENIOR OPTIONS, NFP, an Illinois not for profit corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Arena Analytics, Inc., by and through its undersigned attorneys FisherBroyles

LLP, for its complaint against defendant Friendship Senior Options, NFP, alleges as follows:

### PARTIES

1.     Plaintiff Arena Analytics, Inc. ("Arena" or "Plaintiff") is a Delaware corporation

with its principal place of business in Baltimore, Maryland.

2.     Defendant Friendship Senior Options, NFP ("Friendship" or "Defendant") is an

Illinois not for profit corporation with its principal place of business in Schaumburg, Illinois.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that

Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that a substantial

part of the events or omissions giving rise to Plaintiff's claims occurred in this district and

Defendant resides and is subject to personal jurisdiction here. The contract at issue also provides for jurisdiction and venue in this district.

## COUNT I
## Breach of Contract

5.    Arena realleges and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

6.    Arena and Friendship entered into a written Software as a Service Agreement (the "Agreement") dated as of December 7, 2018. A true and correct copy of the Agreement is attached hereto as Exhibit A.

7.    The Agreement called for Arena to provide specified "SaaS Services" and "Professional Services" (collectively the "Services") to Friendship. The Services are aimed at helping Friendship reduce employee turnover and predict individual employees' likelihood of success at Friendship.

8.    The Agreement was effective for an initial term of three years, with automatic renewal for successive 12-month periods unless terminated with 90 days advance notice by either party.

9.    Pursuant to the Agreement, Friendship agreed to pay Arena an Annual License Fee for the first year of the Agreement in the amount of $110,000, payable in equal quarterly installments of $27,500 per quarter. The Agreement provides that the Annual License Fee would increase by 3% on each annual anniversary.

10.    Arena has provided all Services called for by the Agreement and performed all obligations required of it under the Agreement.

11.    Arena has invoiced Friendship for all quarterly instalments of the Annual License Fees due under the Agreement.

12.     Friendship has breached the Agreement by failing to pay the quarterly instalments due on October 1, 2020, January 1, 2021, and April 1, 2021, in the amount of $28,325.00 each.

13.     Arena has notified Friendship of its defaults on several occasions, beginning in November 2020 and continuing through April 21, 2021.

14.     Friendship has failed to cure its defaults or to pay any of the amounts due.

15.     Pursuant to Sections 5.2 and 5.3 of the Agreement, on May 24, 2021, Arena exercised its right to terminate the Agreement for cause and to accelerate all fees provided for under the Agreement through its original term which, inclusive of the past due amounts, total $201,674.

16.     Friendship has failed to pay the accelerated amount due or any of the other past due amounts.

17.     Pursuant to the Agreement, Friendship is also responsible for payment of a 1.5% monthly late charge on all past due amounts, as well as for all costs and attorneys' fees incurred by Arena in collecting the amounts due.

18.     As a direct and proximate result of Friendship's breaches, Arena has been damaged in the amount of at least $201,674, plus contractual pre-judgment interest on all past due amounts at the rate of 1.5% per month.

**WHEREFORE**, Plaintiff respectfully requests judgment in its favor and against Friendship as follows:

A.     For all damages in the amount of at least $201,674 caused by Friendship's breaches of the Agreement;

B.     For contractual pre-judgment interest at the rate of 1.5% per month on all past due amounts;

C.     For Plaintiff's attorneys' fees, costs, and other expenses incurred in this action; and

D.      Granting Plaintiff such additional relief as this Court deems appropriate.

Respectfully Submitted,

By: /s/ Bradley P. Nelson
One of the Attorneys for Plaintiff

Bradley P. Nelson
FisherBroyles LLP
150 South Wacker Dr., Suite 2400
Chicago, IL 60606
312-300-4005
brad.nelson@fisherBroyles.com


Martin B. Robins
FisherBroyles, LLP
203 N. LaSalle St., Suite 2100
Chicago IL 60601
847-277-2580
martin.robins@fisherbroyles.com

**THIS SOFTWARE AS A SERVICE AGREEMENT** ("Agreement") is entered into as of ̲D̲e̲c̲e̲m̲b̲e̲r̲ ̲7̲t̲h̲, 2018 (the "Effective Date") by and between Friendship Senior Options ("Customer") and Arena Analytics Inc. ("Arena"). Capitalized terms not otherwise defined shall have the meanings set forth in Section 1 below.

## BACKGROUND

A. The SaaS Service provided by Arena uses Arena's Software, which incorporates algorithms and computer models that have been developed and fine-tuned by analyzing Applicant data submitted during the application process, Applicant responses to and interaction with the Arena Screening, and employee data across multiple organizations to help customers reduce employee turnover and predict an individual employee's likelihood of success in a customer organization.

B. Customer desires to receive the SaaS Services and Professional Services as described in this Agreement, and Arena desires to provide such services pursuant to the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the promises contained herein, the parties agree as follows:

1. **Definitions.** The following terms shall have the following meanings when used in this Agreement.

1.1 "Applicant" means an individual who has applied for employment with Customer.

1.2 "Arena Screening" is a web-based questionnaire and data collection instrument provided in the Software for completion by Applicants.

1.3 "Arena Technology" means all of Arena's proprietary technology (including software, hardware, products, processes, algorithms, models, user interfaces, know-how, techniques, designs and other tangible or intangible technical material or information) used in providing the SaaS Service or made available to Customer and its Users by Arena in providing the SaaS Service.

1.4 "Content" means the information, documents, data, and output made available to Customer and its Users in the course of using the SaaS Service.

1.5 "Customer Data" means any Customer information, documents, or electronic files that are: (a) provided by Customer to Arena, or (b) accessed by Arena from systems maintained by or on behalf of Customer in connection with the SaaS Service provided under the Agreement. Customer Data does not include data collected from an Applicant with the Applicant's consent.

1.6 "Deployment" means the conditions described in Section 3 of this Agreement.

1.7 "Documentation" means online help, training materials and other documentation provided or made available by Arena to Customer regarding the use or operation of the SaaS Service.

1.8 "Implementation Services" means the services described in Section 2 of this Agreement.

1.9 "Job Category" means a job category for which a predictive algorithm has been created for use on behalf of Customer.

EXHIBIT A

1.10  "Professional Services" means all technical and non-technical services performed or delivered by Arena under this SaaS Agreement, including, without limitation, Implementation Services, training, maintenance and other services but excluding the SaaS Services.

1.11  "Qualifying Job Category" means a Job Category for which Customer has a related group of job codes for which there are at least 50 employees at Customer's facilities.

1.12  "SaaS Service" means a web-based service that provides use of Arena's Software, which is hosted by or on behalf of Arena and made available to Customer over the Internet.

1.13  "Software" means the object code version of any software to which Customer and its Users are provided access as part of the SaaS Service, including any updates or new versions.

1.14  "Territory" means the United States of America.

1.15  "Turnover" means the proportion of turnovers within the first N days of hire (e.g., 60-day turnover is the proportion of hires who turned over within the first 60 days of employment). When a date range is specified, the range refers to hire dates (2014, for instance, would refer to all people hired in 2014). This applies even if the termination date is outside that date range. If applicable, individuals employed less than N days are omitted (so if Arena last received the data on 1/15/2014, individuals hired after 11/16/2013 would be omitted from the 60-day turnover report). Only terminations, and not transfers, are considered turnover.

1.16  "User(s)" means (a) Customer's employees who are authorized to use the SaaS Service and have been supplied user identifications and passwords to access the Software and (b) Applicants who access the Software during the application process.

2.  **Implementation Services**

2.1  Arena Responsibilities. The Implementation Services provided by Arena pursuant to this Agreement include but are not limited to the following:

   a.  Configuring the application and creating customized model(s) for Customer's organization.
   b.  Integration of Customer's applicant tracking system ("ATS") with the SaaS Service so that the flow of Applicants from the ATS into the SaaS Service will be as seamless as possible.
   c.  Creation of a job code map that clusters related job codes into relevant Job Categories or Qualifying Job Categories.
   d.  Customization of the user interfaces in the SaaS Service to make the look and feel of the interface consistent with Customer's brand.
   e.  Set up of administrative users on the SaaS Service.
   f.  Training recruiters, hiring managers, human resources leaders, and any other desired business leaders on the SaaS Service in connection with the deployment of the initial staff Job Categories. Such training will take place via in-person trainings delivered to relevant Customer personnel.

2.2  Customer Responsibilities. In order for Arena to perform the Implementation Services described above, Customer agrees to timely provide the following:

   a.  Designation of a Customer manager to be the project coordinator for the project.
   b.  A login for the ATS.
   c.  Modified ATS reports, as reasonably required by Arena.

EXHIBIT A

    d. Access to Customer employee(s) who manage the ATS.

    e. Access to recruiting staff to assist with understanding the Customer's Applicant recruiting workflow.

    f. Three years' of data on employee hires and terminations.

    g. A roster of current employees.

    h. Access to Customer human resource staff to review and approve the initial job code map created by Arena.

    i. Availability of relevant Customer staff for training sessions and project meetings.

    j. On the first business day of each month data on: (a) all new hires for the previous month, (b) all terminations for the previous month, and (c) a current list of employees as of the last day of the previous month.

    k. Make necessary staff available as required for Arena to complete the Implementation Services

2.3 <u>Implementation Fee</u>. The fee for the Implementation Services for all Job Categories and all Facilities/Locations is $50,000. The Implementation Fee is due and payable on the Effective Date of this Agreement.

## 3. Deployment

3.1 <u>Deployment Date</u>. The "Deployment Date" will be defined as the earlier of: (a) the date on which the first Applicant to Customer in a Job Category completes the Arena Screening or (b) five (5) months after the Effective Date of this Agreement.

3.2 <u>Usage Rights</u>. Upon the Deployment Date, Arena grants to Customer a non-exclusive, non-transferable, non-assignable, royalty-free, right solely in the Territory, for Customer and its Users to access through the Internet and utilize the SaaS Service and Content solely for Customer's internal business purposes and not for distribution, transfer, sale, or use for the benefit of any other party. Use of the SaaS Service and Content by Customer and its Users is subject to Customer's compliance with the terms and conditions of this Agreement, including, without limitation, Sections 7.1 and 7.2 below and any applicable Terms of Use. Customer acknowledges that this Agreement is a services agreement and Arena will not be delivering copies of any software to Customer as part of the SaaS Services. Customer acknowledges that Arena is not responsible for providing a communications line or other equipment necessary to access and use the SaaS Service or for the charges associated with such communications line or other necessary equipment.

3.3 <u>Annual License Fee</u>. Upon the Deployment Date, Customer will pay a non-refundable, non-pro-ratable (except as set forth in Section 3.4 below) initial annual license fee (the "Annual License Fee") equal to $110,000 annually ($27,500 per quarter), to increase by 3% each annual anniversary thereof, for the use of the SaaS Service. One quarter of the Annual License Fee will be due and payable as of the Deployment Date and on each quarterly anniversary thereafter.

3.4 <u>Adjustment of Annual License Fee</u>. The initial Annual License Fee assumes that Customer has no more than 1,000 employees across all Job Categories and all Facilities/Locations. If, prior to any annual anniversary of the Deployment Date thereafter, Customer has more than 1,000 total employees, then the parties agree to negotiate in good faith an increase in the Annual License Fee for the next year to reflect the additional work, scale and benefit to Customer of deploying to the greater headcount number.

3.5 <u>Customer Responsibilities</u>. Commencing with the Deployment Date and continuing through the Term of the Agreement (as defined below), Customer will continue to provide on the first business day of each month data on: (a) all new hires during the previous twelve (12) months, (b) all terminations during the

EXHIBIT A

previous twelve (12) months, (c) a current list of employees as of the last day of the previous month, and (d) other employee data requested by Arena.

**4. Reduction in Turnover; Guarantee**

4.1 Achievement of Reduction in Turnover. Arena will notify Customer, once Arena has made the necessary determinations to demonstrate that the first to occur of 60-day turnover, 90-day turnover, or 180-day turnover in the deployed Job Categories with a success prediction above the 70% threshold set by Customer is at least 10% lower than Customer's 60-day turnover, 90-day turnover, or 180-day turnover in the same Job Categories taken in the totality, as measured in the relevant period immediately prior to Deployment in the first Job Category (the "Reduction in Turnover"). By way of example for illustrative purposes only, if there are three Job Categories with the first showing a decrease of 25%, the second showing a decrease of 5% and the third showing a decrease of 12%, and when taken together and accounting for differing numbers of employees in the Job Categories the overall decrease is 15%, then this would satisfy the requirements of this Section 4.1 and Reduction in Turnover will have been achieved.

4.2 Guarantee. If, within 24 months of the Deployment Date, Arena has not successfully achieved a significant reduction in turnover as defined above in Section 4.1 (Achievement of Reduction of Turnover), Arena will refund all of the Annual License Fee as outlined in Section 3.3 of this Agreement.

**5. Term; Termination**

5.1 Term. The term of this Agreement shall commence on the Effective Date and shall continue for a period of three (3) years from the Deployment Date (the "Initial Term"). The Agreement shall renew for successive twelve (12) month periods (each, a "Renewal Term") unless either party delivers written notice of non-renewal to the other party at least ninety (90) days prior to the expiration of the Initial Ter, or then-current Renewal Term as the case may be. The Initial Term together with any and all Renewal Terms shall be the "Term."

5.2 Termination. This Agreement may be terminated by either party for cause. In the event either party determines that there has been a breach of or failure to perform this Agreement by the other party it will provide prompt written notice of the existence and nature of the breach, and if the breach is not cured within thirty (30) days after receipt of such notice, then the non-breaching party may terminate this Agreement for cause effective immediately upon written notice to the breaching party. Notwithstanding the foregoing, Arena, in its sole discretion, may immediately terminate Customer's access to the SaaS Service in the event of a breach of Sections 7.1 or 7.2 of this Agreement.

5.3 Effect of Termination. Upon termination of this Agreement (a) Customer's rights to access and use the SaaS Service shall immediately cease, (b) any Confidential Information in the possession of a Recipient shall be promptly returned to the Disclosing Party, and (c) Customer shall immediately pay any amounts then due, and if the termination is as a result of a breach by Customer, then all fees provided for under this Agreement shall accelerate and be immediately due and payable.

**6. Fees**

6.1 Payment. Customer agrees to pay all fees specified in this Agreement when due. All invoices for fees shall be sent by email to the Customer accounting contact provided to Arena hereinbelow and shall state the amount owed. Payment shall be made via electronic funds transfer (EFT) to the account specified on the invoice. Except where other payment terms are provided for in this Agreement, fees shall be paid within thirty (30) days from the date of the invoice.

EXHIBIT A

6.2 <u>Non-Payment and Suspension</u>. In addition to any other rights granted to Arena herein, Arena reserves the right to suspend Customer's access to the SaaS Service if Customer's account becomes delinquent (falls into arrears). Any amount which is not paid by Customer when due shall be subject to a late charge equal to one and a half percent (1.5%) for each month (or portion thereof) in which such amount is due and not paid, plus all expenses of collection. Customer agrees to reimburse Arena for all costs and expenses incurred by Arena in enforcing collection of any monies due under the Agreement, including without limitation reasonable attorney's fees. If Customer or Arena initiates termination of the Agreement, Customer will be obligated to pay all fees due on its account computed in accordance with the Agreement. Arena reserves the right to impose a reconnection fee in the event Customer is suspended and Arena agrees to reinstate access to the SaaS Service.

## 7. The SaaS Service

7.1 <u>Restrictions</u>. Customer shall not, nor will it allow any third party to: (a) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code of the Software used to provide the SaaS Service, (b) copy, republish or otherwise commercially exploit or make available to any person other than authorized Users the SaaS Service or Software, (c) license, sublicense, sell, resell, transfer, assign, distribute the SaaS Service, Software or the Content in any way, (d) use or access the SaaS Service to provide service bureau, time-sharing or other computer hosting services to third parties, (e) modify or create derivative works based upon the SaaS Service, Software, Content or Documentation, (f) publish any performance or benchmark tests or analysis relating to the SaaS Service, Software or Content, (g) remove, modify or obscure any copyright, trademark or other proprietary notices contained in the SaaS Service, Software, Content or Documentation, (h), access the SaaS Service or use the Software, Content, or Documentation in order to build a similar product or competitive product, (i) upload files that contain viruses, Trojan horses, worms, time bombs, cancelbots, corrupted files, or any other similar software or programs that may damage the operation of the SaaS Service, Software or Content; (j) take any actions, whether intentional or unintentional, that may circumvent, disable, damage or impair the control or security systems of the SaaS Service, Software, or Content, nor allow or assist a third party to do so, or (k) otherwise use or copy the SaaS Service, Content, Documentation and/or Arena Technology except as expressly provided herein. Customer acknowledges and agrees that the SaaS Service, Software, Content, Arena Technology and all information disclosed to Customer regarding the SaaS Service, Software, Content, and Arena Technology are the sole property of Arena.

7.2 <u>Customer Responsibilities</u>. Customer is responsible for all activity occurring under its User accounts and shall: (a) abide by all applicable local, state and national laws and regulations in connection with its and their use of the SaaS Service, including those related to data privacy, international communications and the transmission of technical or personal data, (b) ensure that access to the SaaS Service is limited to authorized Users, (c) notify Arena immediately of any unauthorized access to the SaaS Service or any other known or suspected breach of security, and (d) report to Arena immediately and cooperate in every reasonable way to assist Arena to prevent further unauthorized use or disclosure of the SaaS Service, Software or Content that is known or suspected by Customer.

7.3 <u>Account Information and Data</u>. Arena does not own the Customer Data. Customer hereby consents and agrees, on behalf of itself and any third party provider(s) of Customer's applicant tracking system(s): (a) to Arena's access to the applicant tracking system(s), via API or otherwise, and the Customer Data contained therein, for the purposes of Arena performing the services pursuant to this Agreement; and (b) to do such other actions as reasonably necessary to facilitate Arena's access to such applicant tracking system(s) and Customer Data contained therein. Customer grants to Arena a

EXHIBIT A

perpetual, non-exclusive, transferable, assignable, royalty-free, worldwide license to access, use and store the Customer Data to provide the SaaS Service to Customer and for Arena's internal business purposes, including but not limited to improving the predictive capability of the Software and/or otherwise refining or improving Arena Technology. Customer shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness, and intellectual property ownership of all Customer Data.

7.4 <u>Unauthorized Use</u>. In the event of an actual or threatened breach of Sections 7.1 or 7.2 of this Agreement by Customer, Arena shall have no adequate remedy at law and shall be entitled to: (a) all equitable remedies, including immediate injunctive relief (without bond and without the necessity of showing actual monetary damages) enjoining Customer and/or its Users; and (b) any other legal or equitable remedies that may be available.

**8. Representations and Warranties; Disclaimers; Limitations of Liability**

8.1 <u>Representations and Warranties of Arena</u>. Arena represents and warrants that (a) it has the legal power and authority to enter into this Agreement; and (b) it shall comply with the export laws and regulations of the United States and other applicable jurisdictions in connection with the SaaS Service provided hereunder.

8.2 <u>Representations and Warranties of Customer</u>. Customer represents and warrants that (a) it has the legal power and authority to enter into this Agreement; (b) it shall comply with the export laws and regulations of the United States and other applicable jurisdictions in connection with the SaaS Service provided hereunder; (c) it and its Users are not named on any U.S. government list of persons or entities prohibited from receiving exports; (d) it will not re-export any goods or services to persons or entities prohibited from receiving exports; and (e) Customer shall not permit any person or entity to access or use the SaaS Service in violation of any U.S. export embargo, prohibition or restriction.

8.3 <u>Disclaimers</u>. Customer acknowledges and agrees that Arena is providing the SaaS Service on an "**AS IS/WHERE IS**" basis, without warranties of any kind. **ARENA EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES AND REPRESENTATIONS OF ANY KIND OR NATURE WITH RESPECT TO THE SAAS SERVICE, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, OR NONINFRINGEMENT EXCEPT AS EXPRESSLY CONTAINED HEREIN. ARENA MAKES NO REPRESENTATION, WARRANTY, OR GUARANTY AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, TRUTH, AVAILABILITY, ACCURACY, COMPLETENESS OF, OR RESULTS TO BE ACHIEVED FROM THE SAAS SERVICE. ARENA DOES NOT REPRESENT OR WARRANT THAT (A) THE USE OF THE SAAS SERVICE WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-FREE OR OPERATE IN COMBINATION WITH ANY OTHER HARDWARE, SOFTWARE, SYSTEM OR DATA, (B) THE SAAS SERVICE WILL MEET CUSTOMER'S REQUIREMENTS OR EXPECTATIONS, (C) ANY STORED DATA WILL BE ACCURATE OR RELIABLE, (D) ERRORS OR DEFECTS WILL BE CORRECTED, OR (E) THE SAAS SERVICE OR THE SERVER(S) THAT MAKE THE SAAS SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.**

8.4 <u>Limitation of Liability</u>. Regardless of the basis of recovery claimed, whether under any contract, negligence, strict liability, or other theory, Arena's aggregate liability with respect to the SaaS Service and Professional Services provided under the Agreement will be limited to the amount of

EXHIBIT A

any direct damages incurred by Customer not to exceed the amount of fees actually paid by Customer to Arena for its use of the SaaS Service in the twelve (12) month period immediately preceding the event giving rise to such claim. ARENA SHALL NOT BE LIABLE FOR LOSS OR FOR DAMAGE TO RECORDS, DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY, ANY MATTER NOT WITHIN ITS REASONABLE CONTROL, OR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, EVEN IF ARENA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.5 Internet Delays. The Software may be subject to limitations, delays, and other problems inherent in the use of the internet and electronic communications. Arena is not responsible for any delays, delivery failures, or other damage resulting from such problems.

9. **Indemnification.** Customer agrees to defend, indemnify, save and hold harmless Arena, its affiliates, parent, subsidiaries and their respective directors, officers, agents and employees against and from any and all claims, actions, liabilities, costs, expenses, damages, injury or loss (including reasonable attorney's fees) made, brought, incurred, or alleged by any third party to the extent such claims, actions, liabilities, costs, expenses, damages, injury or loss arise out of Customer's or its Users' wrongdoing, misconduct, negligence, or default in connection with the performance of the Agreement. Arena agrees to indemnify, defend and hold Customer harmless from any claim, suit, or proceeding brought against Customer to the extent that such alleges that the SaaS Service or Software infringes on any United States patent, copyright, or trade secret held by a third party. Arena shall have no obligation hereunder if Customer has misused or modified the SaaS Service or Software, has used the SaaS Service or Software in combination with programs or products not supplied by or authorized by Arena, or if the infringement arises out of a breach of Sections 7.1 or 7.2 of this Agreement. Customer must provide Arena with: (a) immediate written notice of any such claim, suit, or proceeding; (b) all necessary information and cooperation necessary for Arena to conduct a defense; and (c) sole control of the defense and settlement discussions. Following notification of any such claim, suit, or proceeding, Arena may: (i) obtain for Customer the right to continue using the SaaS Service, (ii) modify the SaaS Service or Software so that it is non-infringing; or (iii) terminate the Agreement, in which case Customer's right to access and use the SaaS Service or Software shall immediately terminate.

10. **Confidential Information**. "Confidential Information" includes non-public and proprietary information from or about a party ("Disclosing Party"), including trade secrets, know-how and other intellectual property. Customer acknowledges and agrees that the SaaS Service, Software, its Content, the content of the Arena Screening, Arena Technology and all information disclosed to Customer regarding the SaaS Service, the Software, its Content, the Arena Screening and Arena Technology, as well as all pricing information, including without limitation the contents of the Agreement, are "Confidential Information" of Arena. Confidential Information delivered by the Disclosing Party to the other party ("Recipient") shall not, without Disclosing Party's prior written consent, be: (a) disseminated by Recipient to a third party or (b) used by Recipient, except as authorized herein. These restrictions shall not apply if such information: (i) is already in the public domain at the time of disclosure or later through no breach of the Agreement; (ii) was lawfully in Recipient's possession prior to receipt from Disclosing Party without obligation of confidentiality; (iii) is received by Recipient from a third party free to lawfully disclose such information; (iv) is independently developed by Recipient without the use of Disclosing Party's Confidential Information, or (v) must be disclosed by operation of law, provided (A) the Recipient shall promptly notify the Disclosing Party of any such

EXHIBIT A

request for disclosure in order to allow the Disclosing Party full opportunity to seek the appropriate protective orders, and (B) the Recipient complies with any protective order (or equivalent) imposed on such disclosure.

11. **Publicity**. Customer agrees to permit Arena to identify Customer in its marketing materials. Customer grants Arena a perpetual, non-exclusive, transferable, assignable, royalty-free, worldwide license to use and reproduce Customer's Marks solely for purposes of identifying Customer as Arena's customer in its marketing materials. No other license is granted by either party to its Marks. "Marks" includes names, trademarks, logos, whether registered or not, and any other means of identification. Customer agrees to allow Arena to use Customer as a case study in marketing materials. Arena will obtain Customer's prior consent regarding the specific content of any case study which Arena intends to post on its website or otherwise widely disseminate in mass form, such consent not to be unreasonably conditioned, delayed or withheld.

12. **Notices**. Any notice, consent or other communication under this Agreement shall be given in writing and shall be sent by and deemed to have been sufficiently given or served for all purposes as of the date it is delivered by hand, received by overnight courier, or within three (3) business days of being sent by registered or certified mail, postage prepaid to the parties at the following addresses (or to such other address as hereafter may be designated in writing by such party to the other party):

|  |  |
|---|---|
| If to Arena: | Arena Analytics Inc. |
|  | 502 S. Sharp St, Suite 2300 |
|  | Baltimore, MD 21201 |
|  | Attn: President |
|  |  |
| If to Customer: | Friendship Senior Options |
|  | 350 West Schaumburg Road |
|  | Schaumburg, IL 60194 |
|  | Attn:_____ |

13. **Miscellaneous**

13.1 Governing Law/Venue. This Agreement shall be governed by the laws of the State of Illinois, exclusive of any choice of law rules. Each party agrees that if it brings suit in a dispute arising from the Agreement it will do so in the state courts of Illinois or the United States District Court for the Northern District of Illinois.

13.2 Severability. If any provision of this Agreement is held to be invalid or unenforceable, it shall be ineffective only to the extent of the invalidity, without affecting or impairing the validity and enforceability of the remainder of the provision or the remaining provisions of this Agreement. If any provision of this Agreement shall be or become in violation of any federal, state, or local law, such provision shall be considered null and void, and all other provisions shall remain in full force and effect.

13.3 Successors and Assigns. This Agreement may not be assigned by Customer without the prior written approval of Arena but may be assigned by Arena without Customer's consent to: (i) a parent, subsidiary, or affiliate, (ii) an acquirer of the Software or all or substantially all of Arena's assets, or (iii) a successor by merger. Any purported assignment in violation of this Section shall be void. Any actual or proposed change in control of Customer that results or would result in a

EXHIBIT A

direct competitor of Arena directly or indirectly owning or controlling 50% or more of Customer shall entitle Arena to terminate the Agreement for cause immediately upon written notice.

13.4   <u>Complete Agreement; Modification and Waiver</u>.  This Agreement constitutes the entire agreement between the parties with respect to the matter contained herein and supersedes all prior and contemporaneous agreements, warranties and understandings of the parties.  There are no agreements, representations or warranties of any kind except as expressly set forth in this Agreement.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement will be effective unless it is in writing and signed by the party to be charged with such modification, and no such waiver will constitute a waiver of any other provision(s) or of the same provision on another occasion.

13.5   <u>Force Majeure</u>.  If any circumstance should occur that is not anticipated or is beyond the control of a party or that delays or renders impossible or impracticable performance as to the obligations of such party (other than Customer's payment obligation), the party's obligation to perform such services shall be postponed for a period equal to the time during which such circumstance shall extend, or, if such performance has been rendered impossible by such circumstance, shall be cancelled.

13.6   <u>No Third Party Rights</u>.  The Agreement is made for the sole benefit of the parties and confers no rights upon either party's employees, agents, contractors, partners of customers or upon any other person or entity.  Except as otherwise expressly provided, nothing in this Agreement shall create or be deemed to create a relationship among the parties or any of them, and any third party, including a relationship in the nature of a third party beneficiary or fiduciary.

13.7   <u>Counterparts</u>.  The Agreement may be signed in counterparts, which shall together constitute the signed original Agreement.

13.8   <u>Interpretation of Agreement</u>.  The parties hereto acknowledge and agree that the Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the subject matter dealt with in the Agreement.  Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in the Agreement against the party that has drafted it is not applicable and the Agreement shall be interpreted in a reasonable manner to affect the intent of the parties as set forth in the Agreement.

13.9   <u>Headings; Exhibits</u>.  The section headings contained herein are for convenience only and shall not in any way affect the interpretation or enforceability of any provision of this Agreement.  Any schedules and exhibits to this Agreement are incorporated herein and shall be deemed a part of this Agreement as fully as if set forth in the body hereof.

13.10  <u>Electronic Signatures</u>.  This Agreement and related documents may be accepted in electronic form (e.g., by scanned copy of the signed document, an electronic or digital signature or other means of demonstrating assent) and each party's acceptance will be deemed binding on the parties.  Each party acknowledges and agrees that it will not contest the validity or enforceability of the Agreement and related documents, including under any applicable statute of frauds, because they were accepted or signed in electronic form.  Each party further acknowledges and agrees that it will not contest the validity or enforceability of a signed scanned PDF or facsimile copy of the Agreement and related documents on the basis that it lacks an original handwritten

EXHIBIT A

signature. Facsimile and scanned PDF signatures shall be considered valid signatures as of the date hereof. Computer maintained records of the Agreement and related documents when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records.

13.11 Terms and Conditions. This Agreement shall be read so as to be compatible with any terms and conditions residing on Arena's website. However, to the extent there is an irreconcilable conflict between this Agreement and any such terms and conditions, the provisions set forth in this Agreement shall govern.

13.12 Survival. The rights and responsibilities under Sections 5 (Term; Termination), 6 (Fees), 7 (The SaaS Service). 8 (Representations and Warranties; Disclaimers; Limitation of Liability), 9 (Indemnification), 10 (Confidential Information), 11 (Publicity), 12 (Notices) and 13 (Miscellaneous) shall survive any termination of this Agreement.

**IN WITNESS THEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives.

Arena Analytics Inc.

By: _Chris D. K._

Name: Chris Kottke

Title: CFO

Friendship Senior Options:

By: _Michael A Flynn_

Name: MICHAEL A. FLYNN

Title: V.P. / CFO

---

Billing Contact: Patty Sanches
Billing Telephone: 847-884-5673

Billing Email: Patty.sanches@myfso.org
Billing Address: 350 W. Schaumburg Rd
Schaumburg, IL 60194

Administrative Contact: Josh Flaim
Administrative Telephone: 630-946.3385

Administrative Email: josh.flaim@myfso.org

Technical Contact: Charlene Litzsey
Technical Telephone: 847-843-4267

Technical Email: charlene.litzsey@myfso.org

---

EXHIBIT A